UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARCELA ARAYA FERNANDEZ,

                Petitioner,

vs.                           Case No.  2:12-cv-262-FtM-29DNF

PRAMANAN SOMARU, JR.,

                Respondent.

_____

## OPINION AND ORDER

This matter comes before the Court on petitioner Marcela Araya Fernandez's Verified Petition for Return of Child to Costa Rica (Doc. #1) filed on May 11, 2012. Respondent filed an Answer and Affirmative Defenses (Doc. #17) on June 15, 2012. After ordering expedited pretrial proceedings, the Court conducted a bench trial on July 23, 2012.

The Verified Petition is filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670 1343 U.N.T.S. 97, reprinted in 51 Fed. Reg. 10,493 (Mar. 26, 1986) and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq. Petitioner and respondent are the unmarried parents of three year old daughter, I.S.A. Petitioner alleges that I.S.A. is being unlawfully retained in the Middle District of Florida by the child's father, Pramanan Somaru, Jr., who has wrongfully prevented the child's return to her habitual residence

of Costa Rica.  Respondent counters that his daughter's habitual
residence became Florida and, therefore, his admitted retention of
the child in Florida is not wrongful under the Hague Convention.
Respondent also asserts various affirmative defenses which would
preclude a finding that the retention of the child in Florida was
wrongful or in violation of the Hague Convention.

## I.

The general principles relating to the Hague Convention are
well-settled.   To  address  the  harm  done  to  children[1]  by
international parental kidnapping/retention, the Hague Convention
is designed to restore the factual status quo and protect the legal
rights  of  the  non-abducting/retaining  parent.   The  stated
objectives of the Hague Convention are (1) to "secure the prompt
return  of  children  wrongfully  removed  to  or  retained  in  any
Contracting State," and (2) to "ensure that rights of custody and
of access under the law of one Contracting State are effectively
respected in other Contracting States."  Lops v. Lops, 140 F.3d
927, 935 (11th Cir. 1998)(quoting Hague Convention art. 1); see
also United States v. Newman, 614 F.3d 1232, 1235-36 (11th Cir.
2010); Baran v. Beaty, 526 F.3d 1340, 1344 (11th Cir. 2008);
Pielage v. McConnell, 516 F.3d 1282, 1286 (11th Cir. 2008).  Thus,
a court considering a petition for the return of a child under the

---

[1]The Hague Convention effectively defines "children" as being under
16 years of age.  When a child attains the age of 16 years, the
Hague Convention ceases to apply.  Hague Convention art. 4.

-2-

Hague Convention and ICARA "has jurisdiction to decide the merits only of the wrongful removal [or retention] claim, not of any underlying custody dispute. . . . The Hague Convention is intended to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" Lops, 140 F.3d at 936 (citations omitted)(quoting Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996)); see also Baran, 526 F.3d at 1344.

The Hague Convention mandates the return of children to their prior circumstances if one parent's removal or retention violated the custody rights of the other parent and was therefore "wrongful." Hague Convention art. 12; 42 U.S.C. § 11601(a)(4). The removal or retention of a child is "wrongful" where it (1) violates the "rights of custody" of the non-abducting/non-retaining person "under the law of the State in which the child was habitually resident immediately before the removal or retention," and (2) the rights of custody were actually being exercised at the time of the removal or retention, or would have been exercised but for the removal or retention. Hague Convention art. 3; Pielage, 516 F.3d at 1286-87; Lops, 140 F.3d at 935. Therefore, a petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence[2] that: (1) the habitual residence of the child immediately before

---

[2] 42 U.S.C. § 11603(e)(1)(A); Pielage, 516 F.3d at 1286.

the date of the allegedly wrongful removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (3) the petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention.  Ruiz v. Tenorio, 392 F.3d 1247, 1251 (11th Cir. 2004); Lops, 140 F.3d at 935-36.   If petitioner meets this burden, the child who is wrongfully removed or retained must be promptly returned.  Lops, 140 F.3d at 935-36 (citing 42 U.S.C. § 11601(a)(4)); see also Abbott v. Abbott, 130 S. Ct. 1983, 1989-90 (2010).

The general rule that a wrongfully removed or retained child must be returned is subject to six exceptions, each of which may excuse the return of the child.  Hague Convention art. 12, 13, 20. A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence[3] that: (1) the person having care of the child was not actually exercising their custody rights at the time of removal or retention; (2) the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child; (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views"; or (4) the proceedings were commenced more than one year after the

---

[3] 42 U.S.C. § 11603(e)(2)(B).

date of the wrongful removal or retention and "the child is now settled in its new environment."  Hague Convention art. 12, 13. Additionally, a court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence[4] that: (5) there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation"; or (6) return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.  Hague Convention art. 13, 20.  These "affirmative defenses" are narrowly construed to effectuate the purpose of the Hague Convention.  See, e.g., Baran, 526 F.3d at 1345.  Even if an exception is established, the Court has discretion to order the return of a child if return would further the aims of the Hague Convention.  See Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001); England v. England, 234 F.3d 268, 270-71 (5th Cir. 2000); Friedrich v. Friedrich, 78 F.3d at 1067; Feder v. Evans-Feder, 63 F.3d 217, 226 (3d Cir. 1995).

## II.

Based upon the evidence and testimony that the Court found to be credible, the Court makes the following findings of fact:

Marcela Araya Fernandez (petitioner or Araya) was born in Costa Rica, has resided there virtually her whole life, and is a

---

[4] 42 U.S.C. § 11603(e)(2)(A).

citizen of only Costa Rica.  Araya's entire family lives in Costa Rica.  Pramanan Somaru, Jr. (respondent or Somaru) is a naturalized United States citizen who for the past fifteen years has considered his residence to be his parent's house in Cape Coral, Florida. Somaru possesses a United States passport and traveled extensively in the years relevant to this case.  In 2007, Somaru started a call center business in Costa Rica.  Other than this business, Somaru had no particular ties to Costa Rica.

Somaru hired Araya as an employee of his call center business in San Jose, Costa Rica, and in approximately April, 2007, they became romantically involved.  Somaru fired Araya as an employee after a couple of weeks, but they continued their personal relationship.  Somaru and Araya lived together in Costa Rica from May, 2007 through late April, 2008, and the relationship proved to be volatile, with numerous arguments and break-ups followed by periods of reconciliation.  Somaru continued to travel frequently, and there was numerous email communications between the two, although only a relative few were produced as trial exhibits.  The Costa Rica call center was not successful, and Somaru closed it in April or May, 2008.

In May, 2008, Somaru returned to Cape Coral, Florida and rented a house.  Araya followed him shortly thereafter on a tourist visa.  The relationship remained volatile, and Araya returned to Costa Rica and broke up with Somaru.  Araya then learned she was

pregnant, so she informed Somaru and they tried to make their mostly long distance relationship work.  Araya remained in Costa Rica, and her daughter I.S.A. was born in Costa Rica on March 4, 2009.  Somaru arrived in Costa Rica three days before, and was present for the birth of I.S.A.  Somaru left Costa Rica shortly thereafter, but continued to financially support his daughter to the best of his ability.  Somaru returned to Costa Rica for a week when I.S.A. was five or six months old.  Petitioner was always the primary care-giver for I.S.A., who remained in Costa Rica.

Petitioner and respondent (collectively the parents) were often separated during the following two years, with Araya residing in Costa Rica with I.S.A. and Somaru living between Florida and Costa Rica and working primarily in Florida.  They spoke or emailed often about living together in various places, including the United States.  Somaru testified that he and Araya's "main plan" was to make the United States their permanent residence, although the location in the United States was not determined.  Araya testified that Somaru talked a lot about residing in various locations to which he had traveled, but this was essentially just talk.  By 2009, when Somaru was working in Miami, Florida, Araya wanted to be together as a family either in or out of Costa Rica, but it did not happen.  After that, Araya testified, she gave up any intention of permanently leaving Costa Rica because she just did not believe anymore.

Somaru would travel back and forth between his parents' house in Cape Coral and Costa Rica.  Somaru and Araya would live together in one of a series of rental houses when Somaru was in Costa Rica.

In January, 2011, Somaru purchased a restaurant from Araya's stepfather in Costa Rica, but continued to travel back and forth from his parents' house in Cape Coral, Florida to Costa Rica. Araya initially ran the restaurant during Somaru's absences from Costa Rica, but another employee was soon promoted to manager.  In February, 2011, Somaru hired Elizabeth Valde Varantes as a live-in nanny for I.S.A. in Costa Rica.  Ms. Varantes was born in Costa Rica, and speaks only Spanish.

On September 1, 2011, the parents obtained a United States passport for I.S.A. based upon her father's United States citizenship.  Resp. Exh. A.  On September 13, 2011, both Somaru and Araya executed a "Permiso de Salida de Personas Menores de Edad", a consent form which allowed either parent to travel alone with I.S.A. outside of Costa Rica.  Pet. Exh. 15.  Araya testified that the purpose of the passport was to allow I.S.A. to visit her paternal grandparents, while Somaru testified it was in furtherance of their agreement to live permanently in the United States.

From September 21 through October 8, 2011, the parents took I.S.A. on a trip to the United States.  Somaru describes the trip as a chance for I.S.A. to meet her paternal grandparents and for he and Araya to look for a house and work pursuant to their plan to

reside permanently in the United States.  According to Araya, the purpose of the trip was simply to allow I.S.A. to visit her paternal grandparents in Cape Coral.  During this trip Somaru took a side trip to Bolivia to visit his son for several days.  The parents then took I.S.A. to Disney World, and they visited New York, where Somaru was offered employment.  According to Somaru, Araya agreed to move to New York, and Somaru accepted the employment.  I.S.A. and Araya returned to Costa Rica on October 8, 2011.

Somaru testified he returned to Costa Rica in October for a weekend and again in November, 2011, both for the purpose of facilitating the plan to move to the United States.  Araya agrees he came to Costa Rica, but only for visits.

In the later part of November, 2011, Araya described a "final breakup" with Somaru.  Somaru moved out of the house and left Costa Rica, and Araya began sending out employment resumes and actively looking for employment.  Somaru testified he did not believe this was a permanent breakup, and that Araya simply did not answer his calls for several days.  Somaru testified he left Costa Rica and returned to New York to get things under way while Araya looked for apartments in the New York area.  After the breakup, Araya met and shortly thereafter became involved in a romantic relationship with another man in Costa Rica.

On December 1, 2011, Somaru returned to Costa Rica to take Araya and I.S.A. to the United States. Araya had packed up the house, and on Sunday, December 4, 2011, Somaru and the movers took the furniture to store in the nanny's house, which Somaru had rented for that purpose. Araya then told Somaru that she had a job interview the following day in San Jose, Costa Rica, which was three hours away. Somaru testified that Araya insisted on going to the interview to see if she could get the job, and would then quit. Araya testified this was a bona fide job interview, and she was trying to get the job in Costa Rica. Araya drove to San Jose on December 4, 2001, and Somaru and I.S.A. stayed in the nanny's house while Araya was in San Jose. Somaru made arrangements to leave Costa Rica with I.S.A. on December 8 if the nanny's visa was obtained.

In San Jose, Araya interviewed for several days, and was ultimately hired. On December 7, 2011, Somaru, I.S.A., and the nanny took a bus to San Jose and met Araya. According to Araya, she and Somaru agreed that Somaru could take I.S.A. to Florida to visit the child's paternal grandparents if I.S.A. was returned to Costa Rica before December 28, 2011, Araya's birthday. Somaru maintains this was to be their final trip from Costa Rica to their new life in the United States. On December 8, 2012, Somaru and I.S.A. flew from Costa Rica to Florida, while Araya and the nanny (who had not yet obtained a visa) remained in Costa Rica.

Earlier in December, 2011, Somaru had applied to the United States Embassy for a "nanny" visa for Ms. Barrantes.  Somaru's letter to the Embassy stated that Ms. Barrantes had been employed by him since October, 2011; that his fiancé and daughter would be traveling to the United States for the Christmas and New Year holiday; that his fiancé and daughter will return to Costa Rica after the New Year "as my fiancé and Daughter reside in Costa Rica where Ms. Barrantes takes care of my daughter full-time." Pet. Exh. 3.  The visa was issued on December 9, 2011, with the annotation of "babysitter to accompany Somaru family December 2011 - Jan 2012 Florida" and with an expiration date of February 7, 2012. Respondent's Exh. B.

When Araya reported for work in San Jose, Costa Rica on December 8, she was told the position was no longer available. Araya then scheduled job interviews through December 14 in San Jose. She was ultimately offered employment.

The nanny could only travel with one of the parents, and Araya and the nanny left Costa Rica and arrived in the United States on December 15, 2011.  The nanny traveled on the six month "nanny visa", and Araya traveled on a 90-day tourist visa.  Araya testified that the trip to the United States was a holiday trip so I.S.A. could see her paternal grandparents, and that she had no intention of living in the United States permanently.  She testified she

intended to return to Costa Rica for job training which began on December 19, 2011.

Araya, Somaru, I.S.A., and the nanny all stayed at Somaru's parent's house for a day, and then in Somaru's sister's house in Cape Coral.  Somaru testified that after they had been in Florida for about a week, Araya changed her mind and decided she did not want to go to New York, so he found work in Florida.

Araya had scheduled a flight to Costa Rica on December 18, 2011, but missed it and ended up taking a flight to Costa Rica on December 22, 2011.  Somaru testified that on December 21, 2011, Araya told him that she was going back to Costa Rica to wrap up a few things, including employment she had been offered which she no longer wanted, and that she would be back after the holidays.  Araya testified that it was agreed that I.S.A. would be back in Costa Rica by December 26 or 27, before Araya's December 28 birthday.  Araya returned to Costa Rica, and never returned to Florida (other in connection with this litigation).

Somaru testified that he tried to contact Araya in Costa Rica, but had little success.  Sometime after December 28, 2011, Somaru decided he needed to move forward with starting to build a life for I.S.A. in the United States without Araya.  When I.S.A. was not returned by December 28, 2011, Araya contacted Somaru, who told her to "get used to it."

In January, 2012, Araya contacted Costa Rican authorities and initiated procedures to obtain the return of I.S.A. to Costa Rica, revoking her prior travel permission for Somaru and I.S.A.  Araya began work at a new job in Costa Rica on January 2, 2012, and has worked and resided in Costa Rica since then.

The Court resolves the credibility issues between petitioner and respondent on material issues as discussed below.

### III.

### A.  Petitioner's Case:

Petitioner asserts that her daughter is being wrongfully retained in the United States by respondent.  The threshold issues of any Hague Convention case are undisputed in this case.  The parties agree that the child is under 16 years of age, and that Costa Rica and the United States both became signatories to the Hague Convention prior to the events at issue in this case.  The remaining requirements are discussed below.

### (1) Habitual Residence of the Child:

Petitioner must establish that her daughter's habitual residence was Costa Rica at the time respondent refused to allow the child's return to Costa Rica.  Hague Convention art. 3.  This requires the Court to first determine when the alleged wrongful retention took place, because the only point in time when habitual residence is relevant under the Hague Convention is immediately

before the retention.  <u>Barzilay v. Barzilay</u>, 600 F.3d 912, 918 (8th Cir. 2010).

The retention of I.S.A. in the United States was clearly with petitioner's consent until on or about December 28, 2011, the date by which I.S.A. was to be in Costa Rica for petitioner's birthday. Petitioner testified that she agreed that I.S.A. could be taken to and remain in Florida to visit her paternal grandparents as long as I.S.A. was returned to Costa Rica by December 28, 2011.  It is also clear that respondent retained I.S.A. in Florida past that date without the consent of petitioner.  The issue therefore becomes the location of I.S.A.'s habitual residence as of on or about December 28, 2011.

Neither the Hague Convention nor ICARA define habitual residence.  Rather than a definition, the Eleventh Circuit has adopted an approach to determine habitual residence.  Determination of a habitual residence focuses on the existence or non-existence of a settled intention to abandon the former residence in favor of a new residence, coupled with an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized.  <u>Ruiz</u>, 392 F.3d at 1253-54, adopting the approach set forth in <u>Mozes v. Mozes</u>, 239 F.3d 1067 (9th Cir. 2001).  The Court concludes that petitioner has established by a preponderance of the evidence that on or about December 28, 2011, I.S.A.'s habitual residence remained Costa Rica.

The Court finds that the parents never had a settled intention to abandon Costa Rica as a habitual residence and to make the United States the habitual residence for themselves or the child. The version of the facts related by petitioner and respondent, while inconsistent as to material components, both establish a lack of a settled intention to do almost anything together with regard to a habitual residence.  The only settled shared intent the Court finds credible was for I.S.A. to come to Florida for the holidays in December, 2011.  The Court does not find respondent's testimony regarding an agreement to remain permanently in the United States to be convincing.  Rather, the Court finds that the actual state of affairs was as respondent told the immigration authorities in mid-December, 2011 in the nanny's visa application:  Petitioner and I.S.A. resided in Costa Rica, they were going to Florida for a holiday, and they would then return to Costa Rica.  Consequently, the Court finds that at the time the retention began on December 28, 2011, the habitual residence of I.S.A. was Costa Rica.

**(2) "Retention" of the Child:**

Plaintiff must also establish there has been a "retention" within the meaning of the Hague Convention.  Pielage, 516 F.3d at 1287.  "Retention" within the meaning of the Hague Convention "is meant to cover the circumstances where a child has been prevented from returning to his usual family and social environment."  Id. at 1288.  It is undisputed that respondent has maintained custody of

I.S.A. in the United States and has refused to allow the child to return to her mother in Costa Rica.  Respondent also retained the child's United States passport (until surrendered to the court).  I.S.A.'s usual family and social environment was with  Araya in Costa Rica.  The Court finds that there was a "retention" of I.S.A. within the meaning of the Hague Convention from at least December 28, 2011, forward.

**(3) "Wrongful" Retention of the Child:**

The Court must next determine whether that retention was wrongful.  <u>Pielage</u>, 516 F.3d at 1287.  Not every retention is wrongful; retention is wrongful under the Hague Convention only where it is in breach of rights of custody attributed to the non-retaining party.  <u>Id.</u> at 1288.  Under Costa Rican law, as set forth in Pet. Exh. 3, parental custody depends on whether a child was born in or out of wedlock.  Here, it is undisputed that petitioner and respondent were never married, and therefore their daughter I.S.A. was born out of wedlock.[5]  Costa Rican law provides, in such a circumstance that,

> [t]he mother, even when she is under age, shall have custody of the children born out of wedlock and shall have legal rights for that purpose.  The Tribunal could, in special cases, confer custody to the father and natural mother jointly, according to its judgement, or

---

[5]In the event that a child is born in wedlock, Costa Rican law generally provides for custody of both the mother and the father. <u>See</u> Pet. Exh. 3.

upon request from Patronato Nacional de la Infancia and concerning solely the minors' interests.[6]

No evidence has been provided to the Court that either petitioner or respondent requested that the Patronato Nacional de la Infancia grant joint custody of I.S.A.  Accordingly, under Costa Rican law, custody was conferred to petitioner.

Additionally, the Hague Convention specifically provides that "rights of custody" include "the right to determine the child's place of residence."  Hague Convention art. 5.  One parent may not unilaterally determine the country in which the child will live; this means that "the habitual residence of the child cannot be shifted without mutual agreement."  Mikovic v. Mikovic, 541 F. Supp. 2d 1264, 1275 (M.D. Fla. 2007) (quoting Cabrera v. Lozano (In re Cabrera), 323 F. Supp. 2d 1303, 1311 (S.D. Fla. 2004)).  Returning a child to her habitual residence, however, does not require the consent of both parents since the very purpose of the Hague Convention is to "restore the pre-abduction [or retention] status quo," Lops, 140 F.3d at 936 (internal quotations omitted), "and to establish procedures to ensure [the child's] prompt return to the State of [her] habitual residence," Baran, 526 F.3d at 1344 (internal quotations omitted).

The Court concludes that the evidence in this case establishes that respondent's retention of the child was a wrongful retention

---

[6]Petitioner's Exhibit 3 provides the Official Translation of the relevant Costa Rican law regarding parental custody.

under the Hague Convention.  Respondent's unilateral retention of I.S.A., without the consent of petitioner, violates petitioner's custody rights under Costa Rica law.

**(4) Petitioner's Exercise of Custody Rights:**

While the Hague Convention does not define the "exercise" of rights of custody, the Sixth Circuit has stated that "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Friedrich, 78 F.3d at 1065.  The court went on to "hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."  Id. at 1066.  See also Pesin v. Osorio Rodriguez, 77 F. Supp. 2d 1277, 1286–87 (S.D. Fla. 1999).

Under this standard, Petitioner has established she was exercising her rights of custody at the time the child was wrongfully retained.  As established above, petitioner had sole legal custody of I.S.A.  There is simply no evidence of any acts by petitioner which constitute clear and unequivocal abandonment of the child.  Accordingly, petitioner has met her burden of

establishing that I.S.A. was wrongfully retained by respondent and should be returned to Costa Rica, her habitual place of residence.

**B. Respondent's Asserted Affirmative Defenses**

The exceptions to the required return of a child are to be applied narrowly.  Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995); 42 U.S.C. § 11601(a)(4).  The exceptions raised by respondent are discussed below.

**(1) Not Exercising Rights of Custody:**

Respondent's First Affirmative Defense is that Araya was not exercising custody rights in Costa Rica at the time I.S.A. left Costa Rica with Somaru.  Respondent argues that Araya intended to exercise joint custody with him, and that she abandoned the child on December 4, 2011, and on December 8, 2011 by allowing Somaru to leave Costa Rica with I.S.A. with her consent.  (Doc. #17, pp. 8-9.)

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that the person having care of the child was not exercising rights of custody at the time of the removal or retention of the child. Hague Convention art. 13a; 42 U.S.C. § 11603(e)(2)(B); Furnes, 362 F.3d at 711-12.  The Court has already found that petitioner has established by a preponderance of the evidence that she was exercising her rights of custody regarding the child at the time of

retention.   The Court finds no abandonment of the child or an intent to change the child's habitual residence.  Accordingly, this affirmative defense has not been established by the respondent.

**(2) Intent to Abandon Costa Rica as Habitual Residence**

Respondent's Second Affirmative Defense is that the parties intended to abandon Costa Rica as the habitual residence of the child.  (Doc. #17, pp. 9-10.)

In determining whether the parents of a child shared a settled intention to abandon the former country of residence, "[i]t is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary."  Boehm v. Boehm, 2011 WL 863066 (M.D. Fla. 2011), citing, Ruiz, 392 F.3d at 1252.  "[T]here can be a change in the habitual residence of a child when the parents have a settled purpose in moving the child even for a limited period of time."  Tsai-Yi Yang v. Fu-Chiang Tsui, 499 F.3d 259, 272 (3d Cir. 2007)(citation omitted).

On the other hand, courts have generally refused to find a change in habitual residence because one parent intended to move to the new country of residence on a trial or conditional basis.  See Ruiz, 392 F.3d 1254; Papakosmas v. Papakosmas, 483 F.3d 617, 625-26 (9th Cir. 2007); Gitter, 396 F.3d at 135.  Further, "[i]n cases where there is a dispute regarding a child's habitual residence, 'the representations of the parties cannot be accepted at face

value, and courts must determine [habitual residence] from all available evidence.'" Maxwell, 588 F.3d at 252 (quoting Gitter, 396 F.3d at 135). Relevant considerations bearing on the parties' intent include "parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." Maxwell, 588 F.3d at 252 (footnotes omitted).

The only evidence that suggests any intent to abandon Costa Rica under these factors is that on December 4, 2011, Araya's belongings and furniture were stored at the nanny's house. This is not dispositive, and the rest of the evidence weighs in favor of a finding that Araya never intended to abandon Costa Rica. On December 8, 2011, Araya reported for work in Costa Rica and was informed that the position was no longer available. Thereafter, she scheduled various job interviews in Costa Rica and was ultimately offered, and accepted, employment. Afterwards, she traveled to the United States solely on a tourist visa and returned to Costa Rica on December 21, 2011, for job training.

In addition, Araya retained close ties to Costa Rica as both her family and her employment are in Costa Rica. It is undisputed

that I.S.A. and Araya are both Costa Rican citizens and no effort has been made to change this citizenship to the United States. The evidence simply does not suggest a shared intent between the parties. Further, even if the Court were to apply the factor of marital stability to the unmarried parents of I.S.A., the relationship between petitioner and respondent clearly was nowhere near stable. Thus, a majority of the factors weigh in favor of a finding that the parties shared no intent to abandon Costa Rica.

Even if the parties had such a shared intent, this would not alone be an affirmative defense. As the Court has found, part of the habitual residence calculus is a settled intent, and the credible facts in this case do not establish a settled intent to abandon Costa Rica as the habitual residence of I.S.A. The volatile and constantly changing relationship between petitioner and respondent, coupled with respondent's acknowledgment of the temporary nature of petitioner and I.S.A.'s visit to Florida to the immigration officials, dooms any credible argument that there was a settled and shared intent for I.S.A. to abandon Costa Rica as an habitual residence.

Even when there is no shared settled intent on the part of the parents to abandon the child's prior habitual residence, however, a court may find a change in habitual residence in such circumstances where the "objective facts point unequivocally to a new habitual residence, or if the court could 'say with confidence

-22-

that the child's relative attachments to the two countries have changed to the point where requiring a return to the original forum would not be tantamount to taking the child out of the family and social environment in which its life has developed." Ruiz, 392 F.3d at 1254 (citing Mozes, 239 F.3d at 1081). This, however, is clearly not the case here. The Court therefore concludes that there was no settled intent between the parties to abandon Costa Rica as the habitual place of residence.

**(3) Grave Risk of Exposure to Physical or Psychological Harm or Intolerable Situation:**

As his Third Affirmative Defense, respondent asserts that there is a grave risk that returning I.S.A. to Costa Rica will expose her to physical or psychological harm or otherwise place her in an intolerable situation. Respondent argues that the status of petitioner in Costa Rica is unknown, she has no stable living arrangements, and she cannot adequately provide financial support. (Doc. #17, pp. 10-11.)

A court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13 b; 42 U.S.C. § 11603(e)(2)(A). This exception therefore requires evaluation of the grave risk of physical harm to the child, psychological harm to

the child, or if return would otherwise place the child in an intolerable situation.  Like the other exceptions, this is a narrow exception.  England, 234 F.3d at 270-71;  Whallon v. Lynn, 230 F.3d 450, 459 (1st cir. 2000); Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th Cir. 1995).

The assessment focuses upon the child, and it does not matter if the respondent is the better parent in the long run.  Nunez-Escudero, 58 F.3d at 377. "The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." Friedrich, 78 F.3d at 1068.  "A removing parent must not be allowed to abduct a child and then-when brought to court-complain that the child has grown used to the surroundings to which they were abducted." Friedrich, 78 F.3d at 1068.

This exception requires the alleged physical or psychological harm to be "a great deal more than minimal." Whallon, 230 F.3d at 459 (quoting Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000)). Only severe potential harm to the child will trigger this Article 13b exception. Nunez-Escudero, 58 F.3d at 377 (quoting the Supreme Court of Canada in Thomson v. Thomson, 119 D.L.R. 4th 253, 286 (Can. 1994)).  The harm must be greater than what is normally expected when taking a child away from one parent and passing the child to another parent. Whallon, 230 F.3d at 459.  The harm of separating a child from the primary caretaker does not satisfy the

Article 13b exception.  <u>Rydder v. Rydder</u>, 49 F.3d at 372; <u>Nunez-Escudero</u>, 58 F.3d at 376.  Adjustment problems that would attend the relocation of most children is not sufficient.  <u>Friedrich</u>, 78 F.3d at 1067.

The Court finds that respondent has not come close to establishing clear and convincing evidence to support this defense. There is no evidence that petitioner has ever physically harmed the child, or that the child would be exposed to physical or psychological harm if she is returned to Costa Rica.  Contrary to respondent's argument, the evidence establishes petitioner is employed in Costa Rica, has stable living arrangements, and poses no risk of any kind to I.S.A.

The "intolerable situation" portion of the exception encompasses evaluation of the people and circumstances awaiting the child in the country of her habitual residence.  The Court may consider the environment in which the child will reside upon returning to Costa Rica.  <u>Nunez-Escudero</u>, 58 F.3d at 377.  The United States Department of State has stated that an "intolerable situation" under Article 13b was not intended to encompass situations such as return to a home where money is in short supply, or where educational or other opportunities are more limited than in the new country.  It gave as an example of "intolerable situation" where the custodial parent sexually abuses a child. Hague Convention, 51 Fed. Reg. 10494-01, 10510 (March 26, 1986).

> In other words, at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

Blondin, 238 F.3d at 162.   In Friedrich, the Sixth Circuit indicated that the grave risk exception applies only (1) when returning the child meant sending her to a zone of war, famine or disease, or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence for whatever reasons may be incapable or unwilling to give the child adequate protection.   Friedrich, 78 F.3d at 1069.

Here, there is no evidence that either the conditions in Costa Rica in general or the living conditions at petitioner's home in specific come anywhere close to satisfying the "intolerable conditions" exception.   Respondent has not shown that this exception applies.

**(4) Petitioner's Consent/Subsequent Acquiescence:**

In his Fourth Affirmative Defense, respondent asserts that petitioner acquiesced or consented to the child remaining in Lee County, Florida.   Respondent argues that this is established

because petitioner allowed I.S.A. to accompany him from Costa Rica to Florida in December, 2011. (Doc. #17, p. 11.)

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child. Hague Convention art. 13a; 42 U.S.C. § 11603(e)(2)(B). "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).

The testimony the Court finds credible is that petitioner consented to I.S.A. accompanying respondent in December, 2011 for a holiday visit with respondent's parents, not to remaining in the United States permanently. Petitioner did not consent to the retention of her daughter in the United States after December 18, 2011, and did not acquiesce in such retention after it occurred. Therefore, this exception has not been established.

**(5) Abandonment of the Child:**

As his Fifth Affirmative Defense, respondent asserts that petitioner abandoned the child in Lee County, Florida by returning to Costa Rica in December, 2011 without I.S.A. This, petitioner argues, was the failure to exercise custody rights and therefore an abandonment of the child. (Doc. #17, pp. 11-12.)

-27-

While not a recognized affirmative defense, the Court concludes that there is no factual basis to find petitioner abandoned I.S.A. in Lee County or elsewhere.  The credible testimony was that respondent had agreed to return the child to Costa Rica by December 28, 2011.  His wrongful retention of the child, contrary to his agreement with petitioner, does not translate into an abandonment by petitioner.

Accordingly, it is now

**ORDERED**:

1.  The Verified Petition for Return of Child to Petitioner (Doc. #1) is **GRANTED.**

2.  Respondent shall surrender custody of the minor child, I.S.A., to petitioner Marcela Araya Fernandez or her designee **on or before noon on August 23, 2012,** for return to Costa Rica.  Counsel for petitioner shall coordinate arrangements with counsel for respondent.

3.  I.S.A. shall be returned to Costa Rica at petitioner's expense.  Respondent may accompany petitioner and I.S.A. to Costa Rica if he chooses, at his own expense.

4.  The Clerk of the Court is directed to release I.S.A.'s passport to counsel for petitioner or to petitioner so that I.S.A. may travel to Costa Rica.

5.    The Clerk is further directed to enter judgment accordingly and close the case.

**DONE AND ORDERED** at Fort Myers, Florida, this ___17th___ day of August, 2012.


JOHN E. STEELE
United States District Judge


Copies:
Counsel of record
DCCD